al. May it please the Court, Counsel, returning Counsel, my name is Kel Simon, I'm representing the appellant here, the employee, Nicole Burton, in the lawsuit against Freescale and Manpower Semiconductor. The key issue that the District Court erred on was to find a lack of an issue of material fact as to pretext. In this case, the District Court substituted its own views of possible reasons why the plaintiff might have been terminated from her employment for the evidence and the record given by the defendant as to the reasons for her termination. And in so substituting, made himself, the District Court, the decision maker, rather than inquiring into the proper inquiry, which is what was in the decision maker's mind at the time the decision maker made the decision to terminate the plaintiff. Before we get to that, what definition of employer should we use under the Americans with Disabilities Act to decide who was an employer? I think both, and if I'm understanding your question correctly, both Manpower and Freescale were her employer. Where do we look for the definition of employer as used in the Act? I'm not sure I understand Your Honor's question. It's not explicitly defined in the ADA, is it? Not that I know of, Your Honor. Okay, so you're saying we look to our own case law, the Fifth Circuit case law, that's what you're relying on to say they were both employers? And yes, I would say so. I mean, this was not an issue that came up in the District Court except . . . Well, I'm asking you now. That's why I'm asking you. I understand, and I'm not aware of a definition within the ADA of the term employer, but I do understand from having reviewed the Fifth Circuit case law, particularly on the joint employer issue, that as long as the company for which the person is doing work has some right to control the employee's work processes, performance management, compensation, that all of those things make the company an employer for purposes of the ADA. But it is unusual, particularly where management says, we don't want her discharged, but Freescale said, we're not going to work for us anymore, and she told that there are other positions I can get you assigned to. I'm not going to staff you for somebody else. That is unusual now to say that she's been discharged because of Freescale. Well, if Freescale had the ultimate decision maker as far as the decision to terminate her from the Freescale assignment . . . She says that all of the statutes, all of the law requiring the treatment of employees applies to what happens here. That's what your argument is, and I understand it. Yes, sir, and she contacted Manpower as soon as her Freescale assignment ended and said, I'm interested in having another position and was never contacted again about . . . Oh, she was through with Freescale. That's pretty clear. Yeah, there was no doubt about that. Freescale was done with her. Now, what the district court did in assessing the potential reasons for her termination was rejected the reasons that both parties had given to the EEOC and went into the record and found its own reasons why she could have been terminated. Still back on the employer question. How is Manpower instrumental in her termination? If they're asking Freescale, hey, we need more reasons. Well, there's definitely some issues of fact on that issue. The decision maker, Bruce Ackroyd, testified that he . . . The Freescale decision maker testified that the initial input into Jerry Rivera, who was her Manpower supervisor, said, we think that she ought to be let go. Now, Rivera disputes that, and that's one of the key factual disputes here is that Mr. Ackroyd says that he relied on information that the person who he says gave it to him says, I didn't give him this information. But if you look at the email chain that is our record on appeal, page 695, there is clear participation by Manpower in the . . . In an advanced decision, we require more than participation, correct? Yes, and you'll see the discussions in that chain of emails talk about the decision making process and ultimately show that Manpower approved the decision of Freescale to terminate Ms. Burton. So Manpower is involved . . . Well, they had to. They didn't really have much choice. Well, under their agreement, they didn't have much choice, but also if you read the words that the Freescale supervisor wrote, we agree that this decision is proper. So not only is it following its contract with Freescale, but it is also expressing independent opinion that the decision to terminate was proper. And then when Manpower reported to the EEOC the reasons why Ms. Burton was terminated, it adopted those reasons that Freescale gave. Those reasons were the broken wafer in January of 2011, six months before her termination, her use of the internet in June of 2011, and then the failure to qualify tools and the request in July of 2011. Now what happened . . . and Freescale also adopts those same justifications in their EEOC position statement. January, June, July. July is clearly after the decision was made, even if there's dispute. Correct. Correct. But the January wafer problem and a little bit that's described about this industry, that's a very expensive item. The January wafer problem, she was written up for. She was written up for it. She got a disciplinary notice. She signed off on it. Everybody agrees it happened. And then she kept working with no problems for six more months until she reports that she's been injured by the equipment. And then all of a sudden, two weeks later, all these other performance problems supposedly came up. But what the district court did was went back and said, okay, I understand they told the EEOC that there were these failure to qualify tools and wafer boats unbalanced that, okay, these weren't really the basis for the decision, but I'll give them a pass on that because maybe they really did happen after the decision was made. But that's not what Manpower and Freescale told the EEOC. Manpower and Freescale told the EEOC that those were the reasons she was terminated. So then the district court goes back and says, okay, really why she was terminated were four completely different things. And this is what Freescale says in the very introduction to the argument section of their brief. They say that she was terminated for leaning on workstations, failing to cover her nose, not properly escalating issues, and not being proactive. Now, those are four completely different justifications from what was given to the EEOC. The one thing that's in common is the usage of the Internet. And that was told to both the EEOC and was reflected in the record during the depositions in the case. But the issue that we get to from there is that the district court substituted its view that those could have been reasons why she was terminated for the testimony of Mr. Aykroyd who said, I can't remember what I looked at. I can't remember what specific incidents caused me to decide to terminate her. And that's where we get into the problem of there being no articulated reason with evidence of what the decision maker knew at the time that he made the decision. And that's also backed up by the fact that Mr. Aykroyd's testimony about how he reached that decision is not possible based on the testimony of the people who supposedly gave him the information. So Mr. Aykroyd said in his deposition, and there's a chart on this in our brief comparing the different testimony, Mr. Aykroyd says in his deposition that he made the decision based on input from Ms. Alvarez and Mr. Rivera. Ms. Alvarez being the free scale supervisor and Mr. Rivera being the manpower supervisor. Mr. Aykroyd doesn't have any contact with Ms. Burton while she's working. He doesn't know anything about her work performance. He doesn't know what she does. He doesn't know her work habits. He doesn't observe her working. So the only way that he could have known about any deficiencies in her performance would have been by hearing it from other supervisors there on site at free scale. And what Alvarez testified to was I never reported any performance problems to Mr. Aykroyd. And then she changes her mind during the deposition and says actually I was the recommending official. But then when I asked her in her deposition was the July 19th tool qualification issue one of the reasons you decided to recommend that Ms. Burton be terminated, she said yes. And then when I asked her was the July 25th wafer boats not being balanced one of the things that caused you to terminate her, she again said yes. Why isn't it a plausible assumption that you've got the wafer in January which is a terminable offense right there and then as they're preparing it these other things come up and so the decision makers are sort of saying well now we've seen that she wanders and yes the internet and some of that's confused and inconsistent but underneath it all consistent throughout is a basis to terminate. I think the fact that she broke the wafer in January was resolved. There's no testimony anywhere in the record that that was the basis for terminating Ms. Burton. No testimony anywhere in the record that that was the basis to terminate? That that was the basis to terminate, correct. And then she was written up for that instance and then again she just continued working. So there was nobody who said when she broke the wafer oh she needs to go, we need to terminate her. It wasn't until after she raised the medical problems that were caused by the incident at work that they decided to list that as one of the reasons they terminated her but listing that in addition to other reasons that it turns out occurred after the actual termination decision. I have just a couple quick questions on the medical problems caused by. Sure. This depends on regarded as a disability, is that correct? Yes, that's correct, your honor. And would you be able to make that argument if the amended language, the whether or not language hadn't occurred? No, absolutely not. No. No. So what's the best case because I mean you correct me because this is just a superficial understanding but if she has, she goes to the hospital and I take it there's never a complaint to the company for months after her hospital visit. Is that several months passed before she says oh I think it was caused because I was exposed to fumes? There's a series of hospital visits and that's what her deposition testimony reflects is that she had several times when she went to the ER. The injury occurred in March. She had several times she went to the ER I believe in April and May. Is there anything in the record that's actually saying it was caused by? I thought the record established it's hypothyroidism. There's nothing in the record that is an actual medical opinion that says that her thyroid condition was caused by the equipment but what there is in the record and all the district court needed and all the court here needs is her statement in her worker's comp report of injury that she suffered hypothyroidism as a result of exposure to the free scale equipment and that because of the hypothyroidism she now has cardiac issues as well. Would she address her state claims? The state law claims under 451? Yes. She has a worker's comp retaliation claim in that she filed the worker's comp report and disclosed the medical conditions at the same time in the middle of June and that she was the decision determinator. What's your best case that free scale is a subscriber? The cases indicating that free scale is a subscriber, it's not that free scale, free scale doesn't dispute that it's a subscriber. What free scale disputes is that it's A subscriber as to Ms. Burton. The cases would be Peterson versus Apple corrugated packaging and Garza versus Excel logistics. Peterson especially says the temporary company carried the worker's comp insurance but the client who had the right to control the person's employment was the one who was ultimately responsible for the worker's comp retaliation. So that's the best case on that. Analysis wise, the 451 claim is essentially the same as the ADA claim. Did I write Garza versus Excel? Garza versus Excel logistics. No, no, no, I don't know. Sounds familiar. I'm sorry, I don't have the date on it, just the site. But the 451 claim, the analytical structure of that claim is exactly the same as for an ADA claim. Her protected activity was obviously filing the worker's compensation claim. Two weeks later, the company decides to terminate her. I'm not looking at that, I'm just looking at legal arguments. Is she an employee of free scale? Is free scale a subscriber as to her? Yes. The Peterson case clarifies that it's the right to control that's the determining factor. And here, since free scale was the primary employer with the right to control her work, they would be considered the employer under 451. I see my time is up. Thank you. Thank you. May it please the court, counsel, Shafiqa Giratani again, now on behalf of Appley Defendant Free Scale Semiconductor Incorporated, which is a company that makes microchips. We are here requesting that the grant of summary judgment be affirmed against Ms. Burton, a manpower temp assigned to Free Scale, who claims that her reassignment was due to workers' comp retaliation or disability discrimination. I'd like to first address the court's question as to the joint employer issue. Free Scale is not the employer here. There's no dispute in the record. It does not have the authority to hire, fire, or discipline any manpower temps. There's no dispute in the record that manpower hired, paid, provided performance review, disciplined, and actually was the one to end the assignment. We have cited cases that the mere right to request reassignment of a temp does not create an employment relationship. Also, on the state claim, we also assert that Free Scale is not the proper employer. It is undisputed in the record that Free Scale has no workers' compensation insurance for any manpower employee. It doesn't pay for it. There's no pass-through on cost. It doesn't handle workers' comp claims. And so, first, that means there can be no causal connection because it has no dog in that fight. And second, it means that the law is inapplicable. Although counsel spoke of a case, that case does not say that any non-subscriber, as to the employee at issue, can be held responsible for workers' comp retaliation. So, we'd like for summary judgment to be affirmed on that ground. We'd also request that summary judgment be affirmed because the district court properly held that the defendants offered a legitimate nondiscriminatory reason for the reassignment, which was poor performance, with many examples, and Ms. Burton failed to present evidence sufficient to create a genuine issue of material fact as to pretext. Now, what is key, and what's very unusual and rare, is that, in this case, Ms. Burton presents absolutely no evidence disputing the underlying substantive reasons for the decision to reassign her. There's no evidence of disparaging comments, or similarly situated workers were treated differently with the same performance issues. But, more importantly, there's no evidence that the defendants believed she was a good employer. She actually, in many cases, agrees with the performance issues identified. The performance issue of the wafer breaking. She admits that happened, and that that's a performance problem. She admits she was counseled for poor communications, being uncooperative. She even admits that her free-scale supervisor counseled her about being on the internet. This is a rare case, and the district court properly held, that when there is no evidence that the performance justifications did not actually occur, then Ms. Burton has not shown pretext. Now, instead of attacking the substantive reasons, what Ms. Burton instead attacks is process. There was testimony from Ackroyd that he decided that she should be terminated before he knew about the internet. Your Honor, what that testimony is, and I'd like to clarify it, is what Mr. Ackroyd said in the record, and it's the record 500-503-510-11, is that the decision for termination was based on a trend of poor performance. Now, there were many examples in that trend, and the questions about- I thought he specifically said, maybe inconsistently said, no, I did not know about the internet incident when I decided she should be terminated. No, Your Honor. That is, I think, a mis- how the brief phrases it, but that is not what is in the record. What's in the record, as he says, is that there is a trend of poor performance, and he's asked when exactly did you decide- what triggered the reassignment process, which is undisputed in the record, took a month. So a decision was made in about late June. It takes a month to reassign her because she's a temp. They bring in a replacement, and they just roll in the next batch. So that's a month process. What did happen in the record, and I know what Your Honor is referring to, is that when asked about what triggered the process of reassignment, sometimes the witnesses became confused about what event it was in the litany of poor performance examples. Now, what is clear in the record, though, is that the witnesses, although they could not remember at one point in their own deposition, they did clarify and all agreed in the record that what triggered the beginning of the process to reassign her was that Internet. But the Internet usage alone was not the reason for her reassignment. It is a trend of poor performance that's undisputed in the record. Now, that's important because, first, it goes to the nasty case, which the court already referenced, but it's also important because what the Fifth Circuit has always required is that in order to show pretext, you have to refute each and every reason proffered for the decision. There are many instances, examples. Yes? The impression I got from the briefs, and that's the limit of what I know about your case, unfortunately, I thought that there was nothing in the record that went on that happened before they decided to discharge her except what they got together with trying to find something to justify the discharge, which was all after they decided to discharge her, that all of this poor performance isn't proved by anything that was in the record up to the time they decided she was going. It all was what they produced between management and freestyle after they decided she had to go. Is that—that's the impression I get from the briefs. Now, you correct me. Yes, Your Honor, there is quite a bit of documentation, especially considering that this is a temp. The documentation, Your Honor, is at record 349, 352, where a freestyle supervisor prior to June is discussing her attendance problems, her poor communications. There is feedback from even another supervisor discussing that she wanders off. All this is also prior to that June timeframe. That's in the record at 345 through 348. There is also in the record counseling for that broken wafer that Judge Higginson brought up in the record at 364 through 365. Now, there is a close period in time when they're making the decision, which is in late June, to when they communicate to late July. And what Ms. Burton picks on is that during that timeframe, where there's another four or five things that happen, not all of those are documented until maybe a week before that decision is made. But remember, they only happened two weeks prior. So you're talking about events happening in late June, where the documentation is two weeks later when they're discussing those things. You understand all we're looking for here is whether an issue of fact is raised. That's all. I do, Your Honor. But what is key is, first, there's no lack of documentation about these issues. And second, any failure to have documentation, what the court has held, is that does not show pretext. And that is a Joe case that we cited. But I really think that it's important to focus on the fact that all of the evidence does not dispute, for instance, that those events happened. Whether they were documented or not, she has absolutely no evidence disputing that they happened, that the reason for poor performance, her wandering off the Internet, she never disputes that the Internet happened or that at least Freescale believe it because she actually admits that she was counseled for it. All of her evidence is talking about is whether people remember, in a one-month process, what event triggered it at every time in their deposition. Because it is undisputed that they all do agree at some point in their deposition, there is just times where they couldn't recollect two and a half years after the fact, what of the many problems that attempt had triggered them putting into process reassignment. Some of the other issues of pretext that are brought up are whether people remember who they consulted and when, and if it was by email or by phone. And there is no case cited whatsoever in the plaintiff's brief, and no case that I'm aware of where the Fifth Circuit has overturned or reversed summary judgment on the basis that people couldn't remember details about the process. And I'd like for the court to consider what happens if pretext is shown by people not remembering dates or remembering who they talked to when and how far this can devolve. If one witness says, I was on the phone versus it was by email, now there's pretext. If one witness says, we were in a pink room versus white room, now there's pretext. Besides that, the little inconsistencies or memory lapses, the nose incident and the leaning, those first appear in July, correct? Some of those first appear in July. Well, both of those don't appear ever before then, is that correct? Those appear during that time frame and were documented in a performance review. Now, the performance review, Your Honor. I guess the question is, if we freeze the record in June, what of this litany of poor performance exists pre-June? And I'm out of time because I have a co-counsel, but if I may answer your question, the litany of poor performance that exists pre-June is the breaking of the wafer, the problems with walking away, the issues of attendance, poor communications, not accepting responsibility, the issue of leaning of the tools is in the honor law feedback, our previous supervisor record 345 through 358. All those are things that happened previously and that are in our previous performance evaluations. Thank you. Good morning. My name is Scott Brutico and I represent Manpower. I wanted to pick up on something that counsel was just answering because I think it's very important for some of the questions that were asked about documentation. Keep in mind, Manpower provides services of people, bodies to work at engineering fabs. In this case, Freescale came to Manpower and said, we want to replace Ms. Burton. Manpower's role, as is reflected in the record, is merely to take somebody away that Freescale doesn't want unless, and this is the key part, it's illegal. Freescale does not have the contractual right to remove somebody if it's illegal. That is all of Manpower's responsibility and all of their contractual rights is that. They do not have any other contractual rights. So we talk about the joint employer doctrine. There is no dispute that Manpower was her employer. I mean, the district court said that both were pointing at each other and like, no, you employ, no, you employ. That's not a correct reading of the record. Manpower, of course, employs Ms. Burton. However, its employment rights with respect to Ms. Burton on Freescale property is limited by the contract, and that contract only allows Manpower to resist assignment termination if it's illegal. So now that answers the questions about joint employer because I think there's the Trevino case. But Manpower went along. It did, and I'm leading up to that, Your Honor. In fact, they went along after they assured themselves that nothing illegal was going on, right? That's what the contract says. We can say no if it's illegal. If not, we can't. Now, if that makes them an employer for purposes of Title VII, I respectfully disagree with that, and we have cited case law from the Seventh Circuit that actually distinguishes between joint employer and the single integrated enterprise theory that Trevino of our jurisdiction, of our Fifth Circuit, has laid down. But there's the single integrated enterprise that basically says if you do it, we do it, and we are joined at the hip, and then the joint employer doctrine, which is from the Whitaker v. Milwaukee City case and the Torres and Negron case from the Seventh and First Circuits respectively, that says just because you're joint employers doesn't mean you're strictly liable for the actions of the other. No, not strictly liable. And that is what I would submit why Manpower is not liable. But what if Freescale has violated the Disabilities Act? Correct, and that is why Manpower, when Freescale came to Manpower and said we would like to remove Ms. Burton, Manpower didn't just rubber stamp it. They said tell us about this situation, and they needed to know enough to be comfortable that it was not being violated. Well, Manpower is not going to decide that eventually. We're going to decide. Absolutely correct, Your Honor. And suppose Freescale violated the ADA. At least there's a fact issue, and there's a cause that has to be tried. Well, I disagree that there's a fact issue. Then what happens? Then Manpower, what you have to look at is what did Manpower do? And in the record— It's Manpower's employee. Employer, yes. It's Manpower's employee. Right. And what they did when they found out that Freescale wanted to remove her, if you look at the record, and I think this is a critical thing about the case, from 692 to 695 and 745 to 746, that is the documentation that occurred in the week prior to Ms. Burton's notification of termination, which was July 26th was when she was notified. So on July 19th, Mr. Aykroyd communicates with Manpower and says, hey, are you ready to make the changes? And that spurred a discussion from Manpower, and Manpower looks at it and says, well, what happened? And if you look at the documentation at that time, there is extensive documentation, not for some perverse or suspicious motive of papering the file, but rather to communicate with Manpower what was happening and all the various things that Freescale had found that caused Freescale to be legitimately dissatisfied with Ms. Burton's employment. All right. We're back to that question, and that is going to require careful reading of the record. But suppose we decide that there is a lawsuit still for the violation of the Disabilities Act. Who has to defend? Who has to pay? Well, what you have to look at is who committed the illegal conduct. Suppose Burton wins, ultimately. Who's the judgment against? Who has to pay for damages for wrongful discharge? Well, you would have to look at who committed the illegal act. What I'm arguing is that Freescale made decisions with respect to removing her from the assignment. Manpower made decisions as to whether to honor that request, keeping in mind the only way they could refuse to honor it was to— I'm assuming that that all is true. Who's liable? Are you asking me to assume that the ADA was violated? I'm asking you to assume that management went along only because they have no choice. Burton is not going to work for Freescale. They're satisfied that Freescale had a justification for it. All this made up are things that they did after the decision was made, but they're satisfied. But the law turns out to prove that Bancar was wrong on that. They just went along mistakenly. Who's liable? I believe in that case it would be Freescale and only Manpower— Who was not the employer. No, no, no. That's not my issue. Let me explain. Manpower's role in this case is to say what are you accusing her of doing and is that reasonable? And that's why I've given you the record because if you look at that record, no reasonable jury could say that looking at that documentation that Freescale provided to Manpower, that Manpower could possibly believe of any inclination that the Americans with Disabilities Act was violated. In fact, Manpower even said, now listen, you know this woman just filed for workers' comp, right? We need to make sure that we have good reasons because we don't want to give the wrong impression. I mean, that's right in the record that Manpower is pointing that out. You're right about that. Who's liable? Are you asking me to assume that the ADA was violated by Freescale? Yes, yes. Then I guess it would be Freescale. Freescale, even though they're not the employer. That's your words, Your Honor, not mine. I'm not saying that Freescale's not the employer. I'm saying that we are an employer, you know, of her because we pay her. We direct her. But with respect to the joint employer liability where we are not joined at the hip, but not vicariously liable, strictly liable for Freescale, you have to look at what we did, and what we did was responsible and ethical and compliant, okay? It's a joint employment. It's a joint employment, but where neither one is strictly liable for the other. And then who pays is between the two of you. If they're both liable, then that's our problem, Your Honor. Yes, yes. What I think what we need to focus on here is what Burton has done is focus the issue on when did Mr. Ackroyd make the decision. But we have cited the Noste case, and we've talked about this already, where there's going to be an intervening period between the initial determination that he wanted a replacement and the replacement and where she is sent off on her way. In that time, there's intervening time. So if you look at this as you should at the time that Ms. Burton was informed of her termination, the first time she was informed of her termination, we have a body of poor performance, a corpus, if you will, that spans from 2009 to July of 2011. And to say that, oh, my gosh, because Mr. Ackroyd had a decision in late June timeframe and he stated in his deposition at one point that he couldn't exactly remember the chronology of where everything fell down, that that creates a fact issue when you have undisputed evidence, not even an attempt to dispute the evidence, of poor performance, that as of July 26, 2011, spans the entire body of reasons, all consistent with the EEOC position statement, all consistent with the statements made. But the decision to terminate was made no later than June 28, I believe. So what happened in July did not influence that decision. Well, I think when you're asking somebody why was someone terminated, and it does get to a certain metaphysical question of why does someone get terminated, it would be artificial to exclude the most recent occasions of poor performance that absolutely were part of the reason. When you say, Ms. Burton, you're terminated or you're no longer at Freescale, that is absolutely going to be something that you mention as the most recent things first. That is just natural. There is no absolute – sorry, time's up – but there is no inference of discrimination based upon the fact that you mentioned something that just happened that's consistent with the reasons for termination, and that's the Gnostic case. Thank you. On the ADA claim, what evidence is there that manpower regarded her as disabled? Well, the question of regarded as is a little bit – I wanted to address that in just a minute. The manpower knew that she filed the workers' comp claim, and the workers' comp documentation that she filled out specifically discusses the impairments that she had, which were impairments to her endocrine system and her circulatory system. Now, again, to Judge Higginson's question earlier about would this – So every time anybody has any kind of health issue, now we have ADA claims, if you knew they went to the doctor and got a diagnosis, you're regarded as disabled? It's not any health issue. It's any impairment, as that term is defined. Okay. What is the evidence as to what manpower knew about her impairment? Manpower knew that she filed the workers' comp claim in which she disclosed those impairments. What impairments were them? The impairments were a thyroid condition that she said was caused by her exposure to – And how does that make her impaired? Does she have a thyroid condition? How is it I'm not impaired? Sure. The thyroid condition is in concert with the cardiac condition that she was having, heart palpitations, both of which caused her to have to go to the emergency room multiple times during the time that she was working. And manpower knew that? And manpower knew that. Manpower knew that she had gone to the ER several times. They're required – Freescale is required to report it, and I believe there's testimony from the manpower supervisors that even, I think, one of them had gone or had called in the emergency response. And I think your question is a good one because the ADAAA specifically says that somebody who's going under regarded as the best case explorer, and that does seem like it could be headaches or chest pains. I'm not sure that there – there's just not a lot of case law under the ADAAA at this point. The regulations, though, are very clear, and we attach those to our summary judgment response. The regulations are very clear that the plaintiff just has to show that she had an impairment in a major bodily system and that the employer knew about that. The employer doesn't have to know that she was – or doesn't have to be questioned about whether she was substantially limited. It doesn't have to discuss whether it affected a major – Well, obviously thyroid – in these clean areas, they're doing these chips. The air is much cleaner in there than it is out, but she said she had to go out. Well, she – The regulation means that she needs less good air? I think that the reason for going out was that she had to sit down, and that that was where she could go and sit down because of the heart issues that the thyroid problem was causing. I mean, I think ultimately, when you look at the way she phrased it on her workers' comp documentation, that is enough to establish her as having disclosed an impairment, and as long as Freescale and Manpower knew that she disclosed the impairment, that's sufficient to cause – to create a finding that she was regarded as having an impairment under the ADAAA. Now, I did want to address just briefly the joint employer issue. I think that's fairly easily disposed of in the testimony cited by the district court at pages 9 and 10 of its opinion. The district court cites the testimony, who else participated in the decision to end plaintiff's assignment at Freescale, and the answer by Bruce Ackroyd was Manpower, the Manpower supervisor. So the supervisors from both departments were involved supposedly in this process. I want to get just briefly also to the question of the various kinds of misconduct that Ms. Watkins-Giratani pointed to in her opening. She points to the breaking the wafer, the walking away, attendance, poor communication, and Sharon Hunterla's documentation. Bruce Ackroyd testified in his deposition that he didn't know if he knew about that stuff or not, and Mr. Brutico refers to the question of why was Ms. Burton terminated as a metaphysical question. It's not a metaphysical question. It is the defendant's burden in an employment case to articulate the reason that motivated the decision-maker at the time the decision-maker made the decision. If the decision-maker doesn't know what he was motivated by, the defendant doesn't meet his burden. That's usually focusing on after the fact. We also have, well, you've got to come forward with evidence rebutting the nondiscriminatory reasons. So what about their core point, which is nothing in the record rebutts any of the list you gave? She couldn't rebut it because she didn't know that that was the reason. She didn't know that— I thought she was written up contemporaneously for the wafer. She was written up for the wafer. She knew. But then six months later, she's still working there because the wafer was not an issue until after she raised the workers' comp claim. You're good lawyers. Good argument. Thank you, Your Honor.